United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Dania Live 1748 II, LLC, as successor in interest to Dania Live 1748, LLC, Plaintiff, <br><br> v. <br><br> Saito Dania, LLC and Saito Steak House, Inc., Defendants. | Civil Action No. 23-60960-Civ-Scola |

### Verdict and Order Following Non-Jury Trial

This matter arises from a lease dispute between Plaintiff Dania Live 1748 II, LLC, as successor in interest to Dania Live 1748, LLC ("landlord" or "Dania Live") and Defendant Saito Dania, LLC ("tenant" or "Saito Dania"). The landlord alleges that the tenant and Defendant Saito Steak House, Inc. ("guarantor" or "Saito Steakhouse") owe over $1 million in outstanding rent that accrued from December 1, 2020, to August 1, 2022, plus attorneys' fees and costs. The undisputed lease documents include the following: (1) the initial lease executed in 2017 ("Lease"); (2) the letter agreement amending the lease executed on July 13, 2018 ("July Letter Agreement"); (3) the Assignment and Assumption of the Lease executed on November 1, 2019 ("Assignment"); (4) the Guaranty executed on or about November 1, 2019 ("Guaranty"); (5) the second letter agreement amending the lease executed on February 24, 2020 ("February Letter Agreement"); and (6) the document titled "first amendment to lease" executed on September 2, 2022 ("First Amendment").

The landlord argues the tenant breached the Lease by failing to pay rent from December 1, 2020, until the tenant opened for business. The tenant, however, claims that the obligation to pay rent was delayed until the restaurant opened for business, or alternatively that the rent commencement date was April 23, 2022, when the co-tenancy provision was satisfied.

The Court held a one-day, non-jury trial on November 20, 2024. Prior to the trial, the parties submitted a joint pretrial stipulation (ECF No. 41), as well as their proposed findings of fact and conclusions of law. (ECF Nos. 42, 43.) The Court has carefully reviewed these submissions. After considering the credible testimony and evidence, and the applicable law, the Court finds that the rent commencement date was December 1, 2020, and therefore by failing to pay $1,115,406.27 in rent, the tenant has breached the Lease. Similarly, the Court finds that by failing to pay the tenant's obligations under the Lease, the

guarantor has breached the Guaranty agreement.

### 1. Stipulations

The parties have stipulated to the following facts. (ECF No. 41.)

a. Plaintiff-Landlord and Defendant-Tenant are parties to an Indenture of Lease for the real property located at 170 Sunset Drive, Space J115, Dania Beach, FL 33004 ("Demised Premises") dated April 25, 2017 ("Lease").
b. On July 13, 2018, Landlord sent correspondence to Tenant's predecessor, Saito Japanese Steakhouse, Inc., ("Tenant's Predecessor") amending the terms of the Lease to reflect a new Projected Delivery Date (the "July Letter Agreement").
c. On November 1, 2019, Landlord and Tenant's Predecessor executed an Assignment and Assumption of Lease transferring the Lease rights to Tenant (the "Assignment").
d. On September 2, 2022, Landlord and Tenant executed a First Amendment to Lease to provide the physical address of the Demised Premises and to change the notice provisions of the Lease (the "Amendment")[1]
e. Both the Lease and the Amendment contain integration clauses.
f. Specifically, Section 20.16 of the Lease states in pertinent part:
    a. "All negotiations, considerations, representations, and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord and Tenant, and no act or omission of any employee or agent of Landlord shall alter, change or modify any of the provisions hereof."
g. Section 2(E) of the Amendment states:
    a. "[the] Amendment contains all of the agreements of the parties hereto with respect to the matters contained herein, and no prior agreement (other than the Lease), arrangement or understanding pertaining to any of such matters shall be effective for any purpose."
h. On October 31, 2019, Saito Steakhouse, Inc. ("Guarantor") executed a Guaranty of Tenant's obligations under the Lease ("Guaranty").
i. The Guaranty states that Guarantor "guarantees all of the payments to be made by Tenant under the Lease," which includes "minimum rent, percentage rent, additional rent, and all other sums, costs, expenses, charges, payments, indemnifications by Tenant to Landlord."

---

[1] The signature block of the Amendment also includes a scrivener's error, as it should say Dania Live 1748 II, LLC is the signatory.

j. Further, the Guaranty is "unconditional, irrevocable and absolute."
k. The Lease contained a provision permitting Tenant to receive reimbursement for improvements to the Demised Premises. Specifically, Section 20.30 of the Lease, entitled "Tenant Improvement Allowance," provides the formula by which Tenant can recover for sums expended in the buildout of the Demised Premises.
l. The Tenant Improvement Allowance became payable only upon completion of the Payment Conditions, as defined by the Lease.
m. The Payment Conditions required Tenant to provide, *inter alia*, a certificate of occupancy and final lien waivers in order to receive the Tenant Improvement Allowance.
n. If Tenant failed to claim the Tenant Improvement Allowance "within twelve (12) full calendar months following the Commencement Date," then Tenant's right to collect the Tenant Improvement Allowance was forfeited.
o. The Lease required Tenant to remit to Landlord the base rent, a share of the common area expenses, marketing funds and taxes for the Demised Premises (collectively, the "Rent").
p. Initially, Rent was to commence when the Demised Premises "was deemed to be ready for occupancy by the Tenant" and pursuant to a formula in the lease for determining the "Commencement Date."
q. However, due to the delay in opening the restaurant, on February 24, 2020, Landlord and Tenant executed a letter agreement stating "that the Commencement Date of Lease shall be the earlier of: (i) December 1, 2020, or (ii) the date the [Demised] Premises opens to the public" (the "February Letter Agreement").
r. The February Letter Agreement also stated "[t]enant's obligation to commence payments of [Rent] shall commence on the Commencement Date."
s. The Lease Documents further provided that the Rent payment obligation would be based upon the percentage of additional tenants that had opened in the shopping plaza where the Demised Premises is located (the "Co-Tenancy Provision").
t. The Co-Tenancy Provision was satisfied as of December 1, 2021.
u. Tenant has failed to remit all of the Rent and the sum of approximately $562,136.00 remains outstanding (the "Outstanding Sums") which represents base rent, sales tax, common area maintenance expenses and marketing expenses from December 1, 2021, through and including August 1, 2022.
v. Tenant opened for business on September 10, 2022.
w. Landlord sent Tenant and Guarantor a demand for the Outstanding Sums.

    x. Tenant failed to remit the Outstanding Sums.
    y. Guarantor has failed to remit the Outstanding Sums.
    z. Tenant did not obtain a certificate of occupancy until July 2022.
    aa. Tenant did not submit the final lien waivers necessary to obtain the Tenant Improvement Allowance until December 2022.
    bb. Landlord notified Tenant that the Tenant Improvement Allowance was not payable "because Payment Conditions have not been fulfilled in accordance with the terms of the Lease" and therefore, "Landlord has no obligation to pay Tenant any portion of the [Tenant Improvement Allowance]."
    cc. Tenant also asked for permission to pay the Outstanding Sums at the end of the term of the Lease. This request was denied. In addition to failing to receive the Outstanding Sums, Landlord has incurred and continues to incur attorney's fees and costs in prosecuting this action.

**2. Summary of Testimony**

**A. Gary Bazydlo**

Gary Bazydlo is the regional general counsel for the southern region for Kimco Realty, the parent company for Plaintiff Dania Live. He is the vice president, assistant secretary, and corporate representative for Plaintiff Dania Live. Kimco has over 7,000 commercial tenants in developments throughout the country.

Dania Point is a 100-acre development along I-95 near Fort Lauderdale. The original land assembly was done in 2014 and 2015. The property was to be used for mixed-use development. On April 25, 2017, the parties entered into an agreement for Saito to lease 10,000 square feet of space in building J of the development. The main focus at that point was getting the premises designed, permitted and built. The first obligation was on the landlord to build the structure of the building. The Lease contains provision 20.16, which states that the Lease could be modified or altered only by agreement in writing between the landlord and the tenant.

The initial Lease was between the landlord and Saito Japanese Steakhouse, Inc., a related Saito entity, but in November 2019, they executed an assignment, transferring the Lease rights to the tenant. That same month, the landlord and Defendant Saito Steakhouse executed an agreement that Saito Steakhouse would guarantee all payments to be made by the tenant under the Lease.

On February 24, 2020, the parties entered into a letter agreement modifying the Lease. There were three functions of the letter agreement: it set the delivery date of March 1, 2020; it set the commencement date for payment of rent of

December 1, 2020, or the date the restaurant opened, whichever was earlier; and it provided for an HVAC allowance of $193,888.22. The landlord was originally responsible for the HVAC build-out, but the tenant assumed that responsibility, so the tenant was entitled to this allowance as reimbursement.

The original Lease provided in section 20.30 that tenant improvement allowances had to be claimed by the tenant within 12 months following the commencement date or the tenant would forfeit all rights to claim the allowances. There are several conditions the tenant must abide by before seeking reimbursement from the landlord for the tenant improvement allowances.

The Lease also contained a co-tenancy provision in section 20.31. That provision established that the rent commencement date shall be delayed until at least 50% of the gross leasable space was open. But, the letter agreement of February 24, 2020 amended the original Lease and specifically stated that "[n]otwithstanding anything to the contrary contained in the Lease, the parties hereby agree that the Commencement Date of Lease shall be the earlier of: (i) December 1, 2020, or (ii) the date the Leased Premises opens to the public. Tenant's obligation to commence payments of Minimum Rent and all additional rent shall commence on the Commencement date."

When a tenant does not pay rent in a timely fashion, Kimco does not automatically move to default on the Lease. The company treats each tenant individually and separately depending on the relationship between the tenant and landlord. Sometimes they will send an email or make a phone call or letter, and sometimes Kimco will take no action while the premises are still under construction.

When a tenant owes $1 million in arrears, Kimco does not necessarily demand all the monies be paid immediately and in full. Particularly during the COVID-19 pandemic when many tenants could not pay their rents, Kimco would work with each tenant to determine the best way for the tenant to get caught up on its rent obligations.

On November 16, 2022, a Notice of Non-Payment was sent to Saito. The notice indicated that Saito owed $512,419.51. It is very unusual for a tenant to be 23 months in arrears before any written notice is sent by Kimco. Dania Live is now seeking more than $1 million in past rent because its accounting department made an error and gave Saito a twelve-month co-tenancy adjustment to which it was not entitled.

At Dania Point, there are other, larger tenants such as Hobby Lobby, Regal Cinemas, and two Marriott towers. Saito Dania is in the top third in terms of its size relative to other tenants there.

On April 24, 2023, Dania Live sent a demand letter to Saito seeking $562,136.00 which included additional charges for property taxes, sales taxes,

and other charges. Even though it was legally entitled to collect late fees and interest, Dania Live did not seek those additional sums since it was trying to work with the tenant to keep the relationship moving forward. Neither the tenant nor the guarantor have paid the rent owed.

On September 2, 2022, the parties executed the First Amendment to Lease. The First Amendment was signed by Bazydlo on behalf of Dania Live and Minh Lee on behalf of the two Saito entities. The First Amendment provided for a specific address for the restaurant so it could obtain a liquor license and updated the notice provision of the lease with the correct entities and their addresses.

### B. Bruce Corn

Bruce Corn is the real estate broker for Saito. He is responsible for searching for locations for the restaurants and negotiating leases on Saito's behalf. He is not a lawyer.

Corn was involved in negotiations with the owner's representative which led to the February 24, 2020 Letter Agreement that amended the lease. The delivery date was agreed to have occurred as of March 1, 2020, and the commencement date was negotiated to be December 1, 2020. Although Corn negotiated the terms of the Letter Agreement, he knew he was not authorized to sign the Letter Agreement on behalf of Saito. Likewise, although he dealt with Dania Live's representative, Katie Wycoff, he knew Wycoff did not have authority to sign the Letter Agreement. Corn and Wycoff had numerous conversations by phone and by email concerning the rent commencement date.

On January 4, 2022, Corn received an email from Wycoff. That email was in response to Corn's phone conversation with Wycoff in which Corn and Wycoff discussed the commencement date. Wycoff's email indicated that Dania Live was currently researching the request to change the rent commencement and would get back to him when she had a response.

Corn was aware that there was a co-tenancy provision in the original Lease, which provided that the tenant did not have to pay rent until the occupancy of the development was over 50%. Corn believed that the co-tenancy provision of 50% had not been reached prior to Saito opening. Corn did not have any conversations with the landlord regarding the co-tenancy requirement.

On September 20, 2022, Corn sent an email to Jennifer Reuling in Asset Management at Kimco in which he acknowledged that Dania Live was asserting an earlier commencement date than Saito believed should apply. On September 28, 2022, Reuling sent an email to Corn telling him Dania Live was not agreeing to push the rent commencement date.

On November 4, 2022, Corn received an email from Catherine Moran in Asset Management at Kimco. The email indicated that the landlord did not agree to

push the rent commencement date. Shortly thereafter, on November 16, 2022, Saito received the first formal notice of non-payment of rent from Dania Live. Dania Live believed Saito was delinquent on its rent obligations because an earlier commencement date was in effect.

Corn understood that the tenant improvement allowance was $1 million which would be paid by Dania Live once Saito opened and provided lien waivers and other receipts to Dania Live. On December 27, 2022, Corn sent an email to Reuling with proof of expenditures on construction, release of lien, general contractor warranty and certificate of occupancy for the premises so Saito could request on offset of delinquent rent against the total amount due to Saito for construction.

No one from Dania Live ever told Corn that the rent commencement date would be different from that set forth in the original Lease or the Letter Agreement.

### C. Minh Lee

Minh Lee is the owner of Saito Steakhouse and Saito Dania. Lee has been in the restaurant business since 1995 and started Saito Steakhouse in 2001. Saito Steakhouse has seven locations.

From the time the restaurant opened in Dania Point, Saito has paid rent on time. Lee first learned about the opportunity to open a restaurant in Dania Point in 2016 or 2017 from Corn. Lee was impressed with the location and its potential for his restaurant.

It took three years for the landlord to develop the building and deliver it to Saito for its build-out of the property. Lee never spoke with anyone at Dania Live. He relied exclusively on Corn for all of the negotiations.

### 3. Findings of Fact

#### A. The February Letter Agreement set the rent commencement date as December 1, 2020, and voided the co-tenancy provision.

Section 3.2 of the Lease initially provided the formula for calculating the rent commencement date. (Pl.'s Ex. 1 at 5.) The Lease also included a co-tenancy provision, section 20.31, which provided that "Tenant shall not be obligated to open for business, and the Commencement Date shall be delayed, until the date on which the First Co-Tenancy Requirement shall be satisfied (i.e., at least 50% of said gross leasable area is open)[.]" (*Id.* at 59.) However, on February 24, 2020, the parties modified the rent commencement date. (Pl.'s Ex. 6.) The modification, the February Letter Agreement signed by Lee and Bazydlo, stated:

> "Notwithstanding anything to the contrary contained in the Lease, the parties hereby agree that the Commencement Date of Lease shall be the earlier of: (i) December 1, 2020, or (ii) the date the Leased Premises opens to the public. Tenant's obligation to commence payments of Minimum Rent and all additional rent shall commence on the Commencement Date."

(*Id.*) Bazydlo testified that because the February Letter Agreement included the language "Notwithstanding anything to the contrary contained in the Lease", the co-tenancy provision was voided by the February Letter Agreement. The Court agrees. The February Letter Agreement clearly and unambiguously establishes the rent commencement date as the earlier of December 1, 2020, or the date the Leased Premises opens to the public. The property opened to the public in September 2022, making December 1, 2020 the earlier date, and thus the rent commencement date. The Lease's co-tenancy provision—a provision that would change the rent commencement date—runs contrary to the amendment. Because the amendment states the rent commencement date change is "notwithstanding anything to the contrary contained in the Lease", the co-tenancy provision is voided by the February Letter Agreement.

 Bazydlo acknowledged that up until the time of trial, Kimco Realty believed—both when issuing the notice to pay rent (Pl.'s Ex. 10) and during the pendency of this litigation—that the co-tenancy provision was still valid. Accordingly, the landlord mistakenly represented that the tenant owed $562,136. (*See, e.g.,* Pl.'s Ex. 10.) However, because the February Letter Agreement voided the co-tenancy provision, and because the rent commencement date was December 1, 2020, the tenant actually owed $1,115,406.27 in rent. (Pl.'s Ex. 7.) The Lease contains a waiver provision (section 20.1) that states "[f]ailure on the part of Landlord or Tenant to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be deemed to be a waiver by that party of any of its rights hereunder." (Pl.'s Ex. 1 at 42.) The landlord therefore never waived its right to collect the full amount of rent owed—even if the landlord waited almost two years to inform the tenant of the default and mistakenly asked for approximately half the rent that the tenant actually owed. Bazydlo testified that it is rare for Kimco to wait almost two years before sending a demand letter or otherwise communicating to a tenant about a default. However, Bazydlo explained that because the tenant was undergoing construction and had problems with its general contractor, Kimco's priority was getting the tenant open for business.

### B. After the February Letter Agreement, the landlord never agreed to delay the rent commencement date further.

The Defendants contend that a series of conversations in 2022 moved the rent commencement date to after the tenant opened to the public. On January 4, 2022, Katie Wycoff, a representative for Kimco, emailed Corn, stating: "We are currently researching your request regarding a rent commencement date change. Will get back to you when we have a response." (Def.'s Ex. B.) On July 18, 2022, Corn replied to Wycoff and others:

> I am reaching back out to you based on the email below and a follow-up conversation we had in Jan. As you know Saito has finally worked through the city approval process and has received their final CO. and is waiting only on a health inspection. In our last conversation you requested we touch base once the CO had been received and we can then work on a rent commencement date. Can you please reach out and we can further discuss confirming a new date

(*Id.*) Wycoff replied to Corn's email on July 19, 2022, stating "I recall we were waiting on Saito's to open before revisiting the rent commencement. Once they open, Catherine and Jennifer cc'd here in our asset management dept will be your contacts to discuss further." (*Id.*)

Corn testified that around that time, he and Wycoff were also having conversations on the phone about moving the rent commencement date. However, no one from Dania Live ever told Corn that the rent commencement date would be different from the date set forth in the original Lease or the February Letter Agreement. In fact, Bazydlo testified that Wycoff had no authority to alter the rent commencement date, and the email exchange fell outside the formal process to amend agreements between the parties. Corn and Saito knew how the rent commencement date could be changed because they entered into the February Letter Agreement—an agreement in writing signed by all parties—to change the commencement date.

The communications from Dania Live and Kimco personnel do not show that the landlord had changed the rent commencement date; they illustrate a potentiality that the parties would set a new rent commencement date in the future. That potentiality never came to fruition.

### C. The tenant failed to meet the requirements to obtain the Tenant Improvement Allowance.

The tenant has sought to offset the rent owed to the landlord by requesting

reimbursement under the Tenant Improvement Allowance ("TIA") provision of the Lease. Under section 20.30, the tenant could receive up to $1 million in reimbursements for improvements made to the property. (Pl.'s Ex. 1 at 58.) However, the Lease specifies that the tenant must satisfy the Payment Conditions, as defined by the Lease, to claim the TIA. (*Id.*) The Payment Conditions required the tenant to provide the landlord, *inter alia*, a certificate of occupancy and final lien waivers. (*Id.*) And, per the Lease, "if the Tenant Improvement Allowance is not claimed by Tenant within twelve (12) full calendar months following the Commencement Date, then Tenant forfeits all rights to collect such Tenant Improvement Allowance." (*Id.* at 59.) In December 2022, Corn emailed Reuling to claim the TIA and present proof for the Payment Conditions. At that time, however, more than twelve full calendar months had passed since the rent commencement date—December 1, 2020. Because the tenant waited two years to claim the TIA and satisfy the Payment Conditions, the tenant is not entitled to offset its rent obligations with the TIA.

### 4. Conclusions of Law

#### A. Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) as the amount in controversy is over $75,000.00 and the parties are citizens of different states. (*See* ECF Nos. 1, 23, 25, 26.)

#### B. Tenant breached the Lease by failing to remit rent owed.

It is well settled that state law governs issues of contract interpretation that arise in a diversity action. *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1290 (11th Cir. 2022). Furthermore, the Lease provides that it "shall be governed exclusively by the provisions hereof and by the laws of the State of Florida." (ECF No. 1-1 at 55.) For a breach of contract claim, Florida law requires the plaintiff to establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). Neither party contests that the undisputed Lease Documents constitute a valid contract. Similarly, neither party disputes that failure to pay rent constitutes a material breach of the Lease. Instead, the parties disagree about when the rent became due and owing and whether the tenant has failed to pay rent that it owes under the Lease.

##### *(1) The undisputed Lease Documents are clear and unambiguous that the obligation to pay rent commenced on December 1, 2020.*

Under Florida law, if terms of a contract are "clear and unambiguous, ... the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001). As detailed supra, the February Letter Agreement is clear and unambiguous: the rent commencement date is the earlier of December 1, 2020, or the date the Leased Premises opened to the public. Because the property opened to the public in September 2022, the rent commencement date was December 1, 2020.

Similarly, the February Letter Agreement is clear and ambiguous that its terms are "[n]otwithstanding anything to the contrary contained in the Lease." The co-tenancy provision in the original Lease would have changed the rent commencement date and is therefore contrary to the February Letter Agreement. Accordingly, the February Letter Agreement voided the co-tenancy provision, and the rent commencement date was not delayed beyond December 1, 2020. Finally, the February Letter Agreement clearly states: "Tenant's obligation to commence payments of Minimum Rent and all additional rent shall commence on the Commencement Date."

### *(2) The July 2022 emails between the parties did not modify the rent commencement date.*

Under Florida law, modification of a contract requires the same "meeting of the minds" as the formation of the original contract. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1142 (11th Cir. 2010) (citing *Binninger v. Hutchinson*, 355 So. 2d 863, 865 (Fla. Dist. Ct. App. 1978)). The party who alleges a contract modification "carries the burden of proving it." *Charlotte 650, LLC v. Phillip Rucks Citrus Nursery, Inc.*, 320 So. 3d 863, 867 (Fla. Dist. Ct. App. 2021).

The Defendant argues that the emails exchanged between Corn and Wycoff in July 2022 (and other conversations between the two at that time) modified the Lease and February Letter Agreement by moving the rent commencement date to when the tenant opened for business. The Lease, however, contains a clause barring non-written modifications. (Pl.'s Ex. 1 at 47) ("All negotiations, considerations, representations, and understandings between Landlord and Tenant are incorporated herein and *may be modified or altered only by agreement in writing between Landlord and Tenant*, and no act or omission of any employee or agent of Landlord shall alter, change or modify any of the provisions hereof.") (emphasis added).

The integration clause does not automatically bar subsequent oral modifications. Florida law allows written contracts to be modified by oral agreement if "the latter has been accepted and acted upon by the parties in such

manner as would work a fraud on either party to refuse to enforce it." *Pro. Ins. Corp. v. Cahill*, 90 So. 2d 916, 918 (Fla. 1956). The former Fifth Circuit and the Eleventh Circuit have interpreted that principle to apply "even though there was in the written contract a provision prohibiting its alteration except in writing," *Canada v. Allstate Ins. Co.*, 411 F.2d 517, 520 (5th Cir. 1969), but "only where clear and unequivocal evidence of a mutual agreement is presented." *Fid. & Deposit Co. of Maryland v. Tom Murphy Const. Co.*, 674 F.2d 880, 885 (11th Cir. 1982).[2]

The Court finds that there was no mutual assent to modify the rent commencement date. No one from Dania Live ever told Corn that the rent commencement date would be a different date than the one detailed in the February Letter Agreement, and the communications Defendants highlight only illustrate an openness to potentially reconsider the rent commencement date. Openness to potentially reconsider a key contract term is not "clear and unequivocal evidence of mutual agreement." *See Fid. & Deposit Co. of Maryland*, 674 F.2d at 885.

### (3) The Defendant has failed to pay the rent owed starting on December 1, 2020, thereby breaching the Lease.

The landlord has identified $1,115,406.27 in outstanding rent owed by the tenant as of the December 1, 2020, rent commencement date. (Pl.'s Ex. 7.) By failing to pay rent, the tenant has breached the Lease agreement. *See JF & LN, LLC v. Royal Oldsmobile-GMC Trucks Co.*, 292 So. 3d 500, 509 (Fla. Dist. Ct. App. 2020) (stating that failure to timely pay rent constitutes a material breach of a lease). The landlord has been damaged by the tenant's failure to pay more than $1.1 million in outstanding rent. The landlord attests that the outstanding sums do not include interest or late fees and that the landlord is not seeking interest or late fees.

### C. The guarantor breached the Guaranty by failing to pay the rent that tenant owed.

Because the Court found that the tenant owes the landlord rent, and because

---

[2] Florida courts have criticized federal courts' interpretation of the *Cahill* standard, positing that the party seeking to enforce an oral amendment in spite of prohibitive language must show more than just mutual assent, but also that the oral agreement was "accepted and acted upon by the parties in such a manner as would work a fraud on either party to refuse to enforce it." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 995 (Fla. Dist. Ct. App. 2014) (quoting *Cahill*, 90 So. 2d at 918). Because here the Court finds that no mutual assent existed, it need not consider whether the agreement was "accepted and acted upon by the parties in such a manner as would work a fraud on either party to refuse to enforce it." *See id.*

the guarantor also failed to pay the amount the tenant owes, the Court finds that the guarantor has breached the Guaranty agreement. "A guaranty is a collateral promise to answer for the debt or obligation of another." *Fed. Deposit Ins. Corp. v. Univ. Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir. 1985). A guarantor is liable only insofar as the principal is liable. *Id.* A breach of guaranty claim is akin to a breach of contract claim under which the guarantor is alleged to have breached its promise by failing to pay the debt of another on the default of the person primarily liable for payment. *Ecp Station I LLC v. Chandy*, No. 8:15-CV-2523-T-JSS, 2016 WL 3883028, at *3 (M.D. Fla. June 29, 2016) (cleaned up).

The parties have stipulated: (1) that Saito Steakhouse guaranteed Saito Dania's obligations under the Lease, (2) that the Guaranty agreement was "unconditional, irrevocable and absolute", and (3) that Saito Steakhouse "guarantees all of the payments to be made by Tenant under the Lease," including "minimum rent, percentage rent, additional rent, and all other sums, costs, expenses, charges, payments, indemnifications by Tenant to Landlord." Because it is undisputed that Saito Steakhouse guaranteed the tenant's obligations under the Lease, and because the tenant owes rent under the Lease, the guarantor has breached the Guaranty agreement by failing to pay the amount owed under the Lease. Further, the landlord has suffered damages as a result of the guarantor's failure to pay.

### D. Plaintiff is entitled to reasonable fees and costs.

Under Florida law, absent a specific statutory or contractual provision, a prevailing litigant has no general entitlement to attorney's fees. *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 906 F.3d 1329, 1335–36 (11th Cir. 2018). As such, a "contractual attorney's fee provision must be strictly construed." *Id.* (quoting *B & H Constr. & Supply Co. v. Dist. Bd. of Trustees of Tallahassee Cmty. Coll.*, 542 So. 2d 382, 387 (Fla. Dist. Ct. App. 1989)). An agreement for one party to pay another's fees must "must unambiguously state that intention and clearly identify the matter in which the attorney's fees are recoverable." *Id.* (quoting *Sholkoff v. Boca Raton Cmty. Hosp., Inc.*, 693 So.2d 1114, 1118 (Fla. Dist. Ct. App. 1997).

Because the landlord relies only on the attorneys' fees provisions in the Lease and Guaranty, the Court only consults those agreements in determining the landlord's entitlement to fees. *See Balboa Cap. Corp. v. Vital Pharms., Inc.*, No. 21-13263, 2023 WL 2609628, at *8 (11th Cir. Mar. 23, 2023). The Lease (section 20.9) unambiguously dictates that "Tenant agrees to pay to Landlord the amount of all reasonable legal fees and expenses incurred by Landlord arising out of or resulting from any act or omission by Tenant with respect to this Lease". (Pl.'s Ex. 1 at 45.) Further, the Guaranty unambiguously states: "Guarantor also

agrees to pay to Landlord the costs and expenses (including reasonable attorneys' fees) incurred by Landlord for collecting or attempting to collect any item(s) of Rent or otherwise enforcing the Lease against Tenant or collecting under or enforcing this Guaranty." (Pl.'s Ex. 5.)

The provisions do not require that the landlord be the prevailing party in order to collect reasonable attorneys' fees and costs. (*See id.*) ("for collecting or *attempting to collect* any item(s) of Rent") (emphasis added). However, even if they had, the landlord is the prevailing party in this litigation because the landlord succeeded on all significant issues. *See Moritz v. Hoyt Enterprises, Inc.*, 604 So. 2d 807, 810 (Fla. 1992) (holding that "the party prevailing on the significant issues in the litigation is the party that should be considered the prevailing party for attorney's fees."). Under both agreements, the Landlord is entitled to reasonable attorneys' fees and costs.

### 5. Conclusion

Accordingly, for the reasons set forth above, the Court enters a verdict in favor of Plaintiff Dania Live in the amount of $1,115,406.27. The Clerk is directed to **close** this case and any pending motions are **denied as moot**.

**Done and ordered** in Miami, Florida, on November 22, 2024.

_____
Robert N. Scola, Jr.
United States District Judge